# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ROBERT GATZKE, et al.,**
       **Plaintiffs,**

     **v.**                            **Case No. 21-C-0243**

**CITY OF WEST BEND, WISCONSIN,
et al.,**
        **Defendants.**
_____

## DECISION AND ORDER

The plaintiffs in this action propose to represent a class of residents and property owners in the Villa Park subdivision of the City of West Bend, Wisconsin. They allege that, for decades, toxic chemicals from a city-owned landfill adjacent to the subdivision have been leaching into the groundwater and migrating to surrounding properties. West Bend has been aware of the groundwater contamination since the early 1980s and has taken measures to control and mitigate the harm, including closing the landfill and replacing contaminated well water with municipal water. The plaintiffs, however, believe that West Bend has not done enough to protect their properties from the contaminants and that it has failed to properly inform them of the extent of the contamination and its associated risks.

In their latest complaint,[1] the plaintiffs seek damages for "economic losses," such as loss of property value, caused by the contamination of their properties, and an order requiring the defendants to fully remediate the contamination. (Compl. ¶ 49.) Although

_____

[1] In this opinion, all citations to a complaint are to the Third Amended Complaint, ECF No. 73.

the plaintiffs claim that the contamination presents a risk of harm to human health, no plaintiff claims to have suffered bodily harm, sickness, or disease from exposure to contaminants. The defendants are the City of West Bend, two of its officers, and several private companies that may have disposed of hazardous waste at the landfill or succeeded to the liability of companies that did so.

The plaintiffs allege that all defendants are liable under various state-law theories, including negligence, strict liability, and creation of a nuisance. Because the parties are not completely diverse, these claims do not fall within the subject-matter jurisdiction of a federal court. *See* 28 U.S.C. § 1332(a). However, the plaintiffs also allege that West Bend's failure to properly respond to the release of chemicals from the landfill has resulted in violations of their constitutional rights. The plaintiffs allege claims for damages under 42 U.S.C. § 1983 against West Bend and two of its officers, Jay Shambeau (who has been City Administrator since 2016) and Doug Neumann (who has been Director of Public Works since 2015), in their personal capacities. The plaintiffs allege that the presence of these federal claims provides a basis for supplemental jurisdiction over the state-law claims. *See* 28 U.S.C. § 1367(a).

The City of West Bend and its officers now move for summary judgment on the federal claims. These defendants argue that, if the federal claims are dismissed, the court should relinquish supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(c). I consider these matters in this order. I also consider the plaintiffs' request that I defer considering the motion for summary judgment until the plaintiffs have had an opportunity to further develop the factual record. *See* Fed. R. Civ. P. 56(d).

Case 2:21-cv-00243-LA   Filed 05/04/22   Page 2 of 33   Document 91

# I. BACKGROUND

## A.    Factual Background

The landfill at issue is known as the Schuster Drive Landfill. The City of West Bend began operating it in 1964, but it was used by other entities for waste disposal prior to that time. Because of its age, the landfill does not have an engineered liner designed to prevent contaminated liquids from reaching the groundwater beneath it. The landfill predates modern environmental regulation. Indeed, the Wisconsin Department of Natural Resources ("DNR"), which was created in 1967, did not exist when West Bend began operating the landfill. However, the DNR licensed the landfill in 1970 and has regulated it ever since.

In the late 1970s and early 1980s, testing revealed that contaminated groundwater underneath the landfill was migrating to surrounding properties. On October 31, 1983, the Wisconsin DNR sent a letter to the city stating that it was the DNR's opinion that leachate (essentially, contaminated liquid) from the landfill had altered the quality of the groundwater under the landfill and offsite. (ECF No. 41-7.) The DNR noted that the leachate had contaminated two private wells in the vicinity of the landfill. (*Id.*) Among the contaminants found in the groundwater were hazardous volatile organic compounds ("VOCs"). (*Id.*) The DNR stated that, unless the landfill was closed, the contamination would get worse and possibly spread to additional wells. The DNR required West Bend to close the landfill and strongly recommended that it immediately provide an alternative water supply to the affected private well owners. (*Id.*)

In December 1983, the City of West Bend agreed to the entry of a consent order issued by the DNR. (ECF No. 41-4.) Among other things, the order required the city to

3

close the landfill by June 1, 1984, to provide an alternative source of water to a resident whose well was contaminated, and to devise a plan (to be supervised by the DNR) for monitoring conditions at the landfill and offsite after the landfill's closure. (*Id.*)

In September 1985, post-closure testing found that private wells in an area known as the Jansen subdivision were contaminated with VOCs. (ECF No. 41-5.) This finding caused the City of West bend to extend municipal water supply lines to the affected areas so that the contaminated private wells could be closed. (*Id.*) The defendants state that the areas provided with municipal water included the area on which the Villa Park subdivision was later built. (Def. Prop. Finding of Fact ("PFOF") ¶ 15.[2])

In 1988, the city entered into a second consent order with the DNR. (ECF No. 41-5.) This order memorialized the discovery of the contaminated wells in the Jansen subdivision and the city's extension of municipal water to the area in 1986. The order also required the city to install groundwater monitoring wells at new locations. In 1991, the city and the DNR entered into a third consent order under which additional groundwater investigations were conducted. (ECF No. 41-6.)

During the 1990s, the city installed a network of wells for the purpose of extracting contaminated groundwater from the landfill and reducing the volume of contaminated groundwater migrating offsite. The wells are still operating to this day, and the city reports that, in 2020 alone, the wells extracted and treated approximately 20 million gallons of

---

[2] Although the plaintiffs suggest that the defendants have not provided evidence to properly support this factual proposition (*see* Resp. to Def. PFOF ¶ 15), they do not claim that they or others in the Villa Park subdivision draw their potable water from private wells rather than municipal supply lines. Nor do the plaintiffs allege that the potable water supplied to their homes is contaminated with VOCs from the landfill.

4

groundwater. (Def. PFOF ¶ 29.) The plaintiffs, however, note that the extraction system has had its share of problems over the years and has not always operated at full capacity.

On April 26, 2018, representatives of the DNR visited the landfill for a compliance inspection. (ECF No. 40-2.) Defendant Doug Neumann, the City of West Bend's Director of Public Works, was present for the inspection, as was Leo Linnemanstons, a hydrogeologist employed by the city's environmental consulting firm, AECOM Technical Services, Inc. During the inspection, one of the DNR representatives "strongly encouraged" Linnemanstons to perform a "desktop vapor assessment to determine the potential risk to off-site residents." (*Id.* at 2.) Linnemanstons understood this to mean that he should evaluate the potential for "vapor intrusion" from the plume of contaminated groundwater into nearby homes. (Linnemanstons Decl. ¶ 23.) Vapor intrusion occurs when volatile chemicals from underground pass though the foundation of a home or other structure and accumulate inside. The process is similar to radon gas seeping into homes. Vapor intrusion is not a problem outdoors, where the dangerous compounds are diluted by the air. But indoors the concentration of volatile compounds can pose a risk to the health of inhabitants. *See Schmucker v. Johnson Controls, Inc.*, 9 F.4th 560, 562 (7th Cir. 2021).

On May 9, 2018, the DNR representative made a written request to the city for "[a] proposed plan to evaluate the potential vapor pathway in nearby structures/residences (e.g., those within the footprint of the contaminant plumes)." (ECF No. 40-3.) In accordance with the DNR's request, the city asked Linnemanstons to prepare a desktop evaluation, which involved reviewing existing data to determine if vapor intrusion was a concern. On September 13, 2018, Linnemanstons provided a report to the DNR that

5

contained the requested desktop evaluation. (ECF No. 40-4.) The report recommended further study of areas generally south of the landfill. After Linnemanstons submitted the report, he suggested that further study of the potential for vapor intrusion be conducted in phases. The DNR concurred with Linnemanstons' proposal, and the city authorized Linnemanstons to proceeded with the investigation.

The investigation began in the first quarter of 2019 with the installation of monitoring wells. Later, Linnemanstons tested groundwater at certain residences, tested for vapors immediately below the foundations of residences (sub-slab testing), and took indoor air samples from residences. Results were submitted to the DNR on September 18, 2019. The sub-slab testing showed that, at some residences, concentrations of VOCs underneath the structures were present at levels that, under DNR standards, "indicated the potential for the intrusion of vapors into the interior of the building." (Linnemanstons Decl. ¶¶ 39, 54, ECF No. 40.) Further, the indoor air samples at some residences showed the presence of VOCs at levels that, under DNR standards, warranted action to correct the problem before injuries to residents occurred. (*Id.* ¶¶ 39, 53.) At other locations, however, the samples showed that the VOC concentrations were below the DNR's recommended levels.

Because the September report revealed evidence of vapor intrusion into some structures, the city immediately took action to protect residents. The city mailed a letter to residents of the Villa Park subdivision notifying them of a public meeting regarding the vapor intrusion investigation. (Neumann Decl. ¶ 23; Shambeau Decl. ¶ 25.) Additionally, city representatives, including defendants Neumann and Shambeau, went door-to-door in the Villa Park neighborhood to encourage residents to attend the public meeting and

6

left flyers about the meeting at residences in the neighborhood. (Neumann Decl. ¶ 24; Shambeau Decl. ¶ 26.) The public meeting was held on October 16, 2019. Nearly 200 residents attended. During the meeting, AECOM gave a presentation about the vapor intrusion in the area and answered residents' questions. Defendants Neumann and Shambeau were also present, as were representatives from the DNR and the Wisconsin Department of Health Services.

Following the public meeting, and in response to input from the DNR (Letter of Oct. 31, 2019, ECF No. 40-8), the city expanded its testing for vapor intrusion and took steps to protect residents deemed especially susceptible to harm from VOCs. To identify residences inhabited by "sensitive receptors" of VOCs, such as pregnant women, the city asked residents in the area to complete a demographic survey. (Neumann Decl. ¶ 28; Shambeau Decl. ¶ 30; Linnemanstons Decl. ¶ 47.) Representatives of the city personally canvassed the area to make sure that information was obtained from residents who did not return the survey. (Neumann Decl. ¶ 30; Shambeau Decl. ¶ 32.) The city then prioritized the testing of homes with sensitive receptors. AECOM began testing residences in November 2019, after the city obtained property access agreements from occupants. (Linnemanstons Decl. ¶ 49.) In February 2020, the DNR sent a letter to the city complimenting it on its efforts to investigate and respond to vapor intrusion in the area. (ECF No. 42-2.) On March 12, 2020, AECOM sent an interim report to the DNR about its findings. (ECF No. 40-10.) AECOM concluded that vapor intrusion was a concern in an area in the southeast portion of Villa Park.

To date, a total of 190 residences have been tested for vapor intrusion. (Linnemanstons Decl. ¶ 59.) In 23 residences, VOCs in concentrations above DNR

standards were detected in either the sub-slab sample or the indoor air sample or both. (*Id.* ¶ 60.) If the residence had an exceedance in the sub-slab sample alone, the city addressed the problem by installing a sub-slab depressurization system, which is a technology that prevents vapor from passing through the basement floor and into the structure. The same technology has been successfully used to address radon intrusion. (*Id.* ¶¶ 56–58.) If the residence had an exceedance in the indoor air sample, which indicates a greater threat to occupant health, the city immediately provided the residence with an indoor air purifier until the sub-slab depressurization system could be installed. (*Id.* ¶ 56.) From the beginning of 2018 through June 2021, the city spent more than $1.5 million on outside contractors for work relating to the landfill, most of which related to the vapor intrusion investigation and the installation of temporary and permanent mitigation measures. (Shambeau Decl. ¶ 40.)

There are four named plaintiffs in the present case: Robert Gatzke, Theresa Deuel, Bryan Schofield, and Geoffrey Rickaby. Gatzke has resided in the Villa Park subdivision since 2011 (Gatzke Decl. ¶ 2, ECF No. 60-19), Deuel since 2019 (Deuel Decl. ¶ 2, ECF No. 60-16), Schofield since September 2018 (Schofield Decl. ¶ 2, ECF No. 60-18), and Rickaby since February 2018 (Rickaby Decl. ¶ 2, ECF No. 60-17). During the vapor intrusion investigation, the city tested the residences of Gatzke, Schofield, and Rickaby for the presence of VOCs. The residence of Theresa Deuel was not tested because sensitive receptors were not inhabitants, and the residence was located outside the area deemed potentially susceptible to vapor intrusion. Of the tested residences, only Gatzke's revealed the presence of VOCs in concentrations exceeding DNR standards, and then only in the sub-slab sample. (Linnemanstons Decl. ¶¶ 63–68.) This indicated that VOCs

8

were not significantly migrating into the residence itself. (*Id.* ¶ 65.) However, due to the presence of VOCs beneath Gatzke's home, the city installed a sub-slab depressurization system. (*Id.* ¶ 66.)

Although the named plaintiffs question whether the city's testing protocol and installation of mitigation measures were adequate to protect their health, no plaintiff claims that independent testing has shown that he or she has been exposed to dangerous levels of VOCs. And the named plaintiffs have each admitted that they are not making any claim for bodily injury, sickness, or disease as a result of the matters alleged in their complaint. (ECF Nos. 66-1 to 66-4 (responses to requests for admission).) As far as the record reveals, no person has ever suffered an injury, sickness, or disease from inhaling VOCs emanating from the contamination caused by the Schuster Drive Landfill.

## B. Procedural Background

The plaintiffs commenced the present suit as a proposed class action on February 23, 2021, against the City of West Bend exclusively. The original complaint included primarily state-law negligence and other toxic-tort claims for compensation for the alleged devaluation of the plaintiffs' properties. The parties to this action are not completely diverse, and so the alleged state-law claims did not provide a basis for federal subject-matter jurisdiction. However, the original complaint included a claim under the Emergency Planning and Community Right-to-Know Act of 1986 ("EPCRA"), 42 U.S.C. §§ 11001–50. The plaintiffs alleged that the EPCRA claim provided a basis for federal jurisdiction and that the court could exercise supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

9

Shortly after the plaintiffs filed the complaint, West Bend filed a motion for summary judgment on the EPCRA claim. The motion argued that the claim had to be dismissed because the plaintiffs did not provide proper pre-suit notice. The motion also argued that, if the EPCRA claim was dismissed, the court should relinquish supplemental jurisdiction over the state-law claims. In response to this motion for summary judgment, the plaintiffs filed an amended complaint that asserted claims under 42 U.S.C. § 1983 against West Bend under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and against new defendants Jay Shambeau and Doug Neumann in their personal capacities. The amended complaint alleged three § 1983 legal theories: (1) defendants Neumann and Shambeau have exposed the plaintiffs to exposure to toxic chemicals in violation of their substantive due process right to bodily integrity, (2) the actions of Neumann and Shambeau with respect to the landfill have resulted in an unreasonable seizure of the plaintiffs' property in violation of the Fourth Amendment, and (3) the defendants have failed to protect the plaintiffs from a state-created danger, in violation of substantive due process. In addition to opposing summary judgment on the EPCRA claim, the plaintiffs argued that, even if the EPCRA claim were dismissed, the new federal claims would provide grounds for federal jurisdiction.

In a prior order, I granted West Bend's motion to dismiss the EPCRA claim. *See Gatzke v. City of West Bend*, __ F. Supp. 3d. __, 2021 WL 4302866 (E.D. Wis. 2021). In the same order, I found that the § 1983 claims shared a common nucleus of operative facts with the state-law claims against West Bend and thus provided a basis for supplemental jurisdiction over those state-law claims. *Id.* at *7. Although I alluded to the possibility that the § 1983 claims were "wholly insubstantial and frivolous" and may have

10

been alleged solely to provide a basis for federal jurisdiction, I ultimately determined that I could not make a finding of frivolousness at that time. *Id.*

Since the date of my prior summary-judgment order, the plaintiffs have filed a third and then a fourth amended complaint. The latest amendments do not alter the § 1983 claims against West Bend, Neumann, and Shambeau. Instead, they add state-law claims against private entities who may be liable for dumping toxic waste at the Schuster Drive landfill. The merits of the claims against the private entities are not relevant to the issues addressed in this order.

Defendants West Bend, Neumann, and Shambeau now move for summary judgment on the § 1983 claims and again contend that, if the federal claims are dismissed, the court should relinquish supplemental jurisdiction over the state-law claims. In responding to this motion, the plaintiffs filed a request that I defer consideration of the motion until the plaintiffs have had a chance to further investigate their claims. *See* Fed. R. Civ. P. 56(d). Plaintiffs' counsel has filed a declaration in which he identifies the matters on which plaintiffs believe factual development is needed. (ECF No. 60-20.) However, the plaintiffs also oppose the motion for summary judgment on the merits. In this order, I consider the motion for summary judgment and the request to defer consideration of the motion.

## II. DISCUSSION

### A.    Background Legal Standards

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light

most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

Federal Rule of Civil Procedure 56(d) provides that, after a party moves for summary judgment:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
>
> (2) allow time to obtain affidavits or declarations or to take discovery; or
>
> (3) issue any other appropriate order.

Defendants Neumann and Shambeau invoke qualified immunity. The doctrine of qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). More than a "mere defense to liability," it provides "immunity from suit." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The doctrine "is an affirmative defense." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). "[O]nce the defense is raised, it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established

Case 2:21-cv-00243-LA   Filed 05/04/22   Page 12 of 33   Document 91

at the time of the alleged violation. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam). These questions may be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009). "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

## B.    Unreasonable Seizure

The plaintiffs allege that defendants Neumann and Shambeau are liable for damages because they each "caused an unlawful seizure by allowing Plaintiffs' and the class members' properties to be unreasonably destroyed." (Compl. ¶ 143.) In briefing this claim, the parties argue over whether any plaintiff could prove that his or her property has been "destroyed." The defendants note that each plaintiff continues to live in his or her home, that each home receives municipal water rather than well water drawn from the contaminated groundwater on site, that no residence has been shown to have dangerous concentrations of VOCs in the indoor air, and that a homeowner in the contaminated area recently sold his home for 24% more than he paid for it three years earlier. The plaintiffs, in turn, state that they intend to retain an expert who "may" opine that "homes on contaminated groundwater have no value." (Nace Decl. ¶ 26.)

However, a "seizure" may occur even when property is not completely destroyed. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Thus, even if the plaintiffs' properties were only devalued and not completely destroyed, a claim for unreasonable seizure would not necessarily fail.

13

But the plaintiffs' claim for unreasonable seizure fails for a different reason. A seizure within the meaning of the Fourth Amendment cannot occur when a government official merely fails to prevent an interference with a person's property rights. Instead, a seizure requires that a government official *intend* to physically interfere with the property. *See Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) ("Violation of the Fourth Amendment requires an intentional acquisition of physical control."). In other words, "the detention or taking itself must be willful." *Id.* This is so because "the Fourth Amendment addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Id.* (citation omitted).

In the present case, the plaintiffs do not, and cannot, allege that defendants Shambeau and Neumann intended to interfere with their property rights. These men did not dump toxic chemicals into the landfill or allow others to do so with the intent that the chemicals would reach the plaintiffs' properties and interfere with their possessory interests. Indeed, they did not even hold their offices until 2015 and 2016, long after the landfill was closed and dumping had ceased. The plaintiffs have not pleaded a claim for unreasonable seizure against the City of West Bend itself. But for the sake of completeness, I note that nothing suggests that any official associated with the city at any time acted with an intent to interfere with anyone's property rights. Although the city intentionally operated a landfill, no allegations suggest that city officials intended that chemicals from the landfill reach surrounding properties. At most, the resulting contamination was an accidental effect of otherwise lawful government conduct (operating a landfill), which is not a seizure. *Brower*, 489 U.S. at 596; *see also Residents Against Flooding v. Reinvestment Zone Number Seventeen*, 734 F. App'x 916, 920–21

14

(5th Cir. 2018) (city projects that accidentally flooded the plaintiffs' properties did not result in seizures because the city did not intend to flood the properties).

The plaintiffs allege that Shambeau and Neumann failed to prevent the contamination from reaching the groundwater under their properties by not fully remediating the contaminated plume. This allegation is conclusory and unsupported, in that no facts acts alleged in the complaint suggest that, prior to 2015 and 2016, when the defendants first assumed office, the plume had not already spread to the plaintiffs' properties. However, even if this allegation were true, it would not establish that a seizure within the meaning of the Fourth Amendment occurred. A government official does not intentionally apply physical force to property by failing to apply the physical force necessary to stop hydrogeological processes from transmitting a plume of contaminants from the ground beneath city property to the ground beneath private property.

At the very least, Shambeau and Neumann are entitled to qualified immunity from liability under the Fourth Amendment. The plaintiffs have not cited, and I have not found, any case even hinting at the possibility that a government official seizes property within the meaning of the Fourth Amendment by failing to prevent an unintentional interference with the property. Although cases recognize that government officials can be liable for failing to intervene in another official's ongoing violation of a plaintiff's rights, these cases do not apply here because Shambeau and Neumann are not alleged to have stood idly by while other government officials intentionally and unreasonably seized the plaintiffs' property. *See, e.g., Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). Accordingly, Shambeau and Neumann could not have acted in defiance of clearly established Fourth Amendment law. Summary judgment will be granted on this claim.

15

## C.    Bodily Integrity

The plaintiffs allege that defendants Neumann and Shambeau violated their right to bodily integrity, which is safeguarded by the substantive component of the Due Process Clause of the Fourteenth Amendment. *See Wilson v. Cook County*, 742 F.3d 775, 780–81 (7th Cir. 2014). The plaintiffs allege that these defendants violated this right by allowing them to inhale the VOCs that had migrated into their homes from the contaminated plume and by failing to properly disclose the risk of vapor intrusion.

The right to bodily integrity protects against *intentional* government intrusion into the body of a person. *See, e.g., Cruzan by Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261 (1990) (medical treatment); *Washington v. Harper*, 494 U.S. 210 (1990) (forced administration of psychotropic medication); *Ingraham v. Wright*, 430 U.S. 651 (1977) (corporal punishment); *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010) (sexual abuse). In the present case, the plaintiffs do not, and cannot, allege that Neumann and Shambeau intentionally directed VOCs at or into their bodies. Instead, as discussed in the context of the Fourth Amendment, the presence of VOCs on the plaintiffs' properties was caused by the city's operation of the landfill decades before Neumann and Shambeau assumed office, along with hydrogeological processes that have occurred since then.

Again, the plaintiffs allege that Neumann and Shambeau failed to take steps to prevent the contaminated plume from reaching their properties and failed to promptly warn them of the dangers presented by VOCs. However, the plaintiffs have not cited, and I have not found, authority holding that a deprivation of the right to bodily integrity can occur when the government merely fails to prevent hazardous substances from reaching a person or fails to warn the person about the possibility of ingesting or inhaling such

16

substances. The plaintiffs cite the Sixth Circuit's opinion involving the Flint Water Crisis, in which the court held that certain municipal and state officials who caused the crisis could be sued for violating the right to bodily integrity of the residents who consumed the water. *See Guertin v. State*, 912 F.3d 907 (6th Cir. 2019). But even that case involved an intentional, affirmative action directed at the bodies of the residents: switching the city's drinking water supply to a new source with knowledge that the water from that source was not properly treated and would likely cause substantial bodily harm, such as lead poisoning and Legionnaires' disease, to those who ingested it. *Id.* at 926–29. Importantly, in the same opinion, the Sixth Circuit determined that other government officials, who were not involved with the decision to switch the city's water source but allegedly failed to prevent harm after the fact or to "blow the whistle," were not liable for depriving the plaintiffs of their right to bodily integrity. *Id.* at 929–32. The Sixth Circuit also emphasized that liability under a bodily-intrusion theory requires the government actor to "knowingly and intentionally" subject the individual to life-threatening substances without their consent. *Id.* at 921.

For these reasons, I conclude that Neumann and Shambeau could not have deprived the plaintiffs of their right to bodily integrity. Moreover, given the absence of any case law holding that a government official can be liable under a bodily-integrity theory for failing to prevent or warn of harm not of the official's own making, Neumann and Shambeau are entitled to qualified immunity.

Before moving on, however, I note that the plaintiffs' bodily-integrity claim is similar to their claim based on state-created danger, in that each claim alleges that the defendants engaged in conduct that shocks the conscience. (*See* Compl. ¶¶ 137 & 152.)

17

I analyze the element of shocking the conscience in the next section and conclude that the plaintiffs have not pleaded and cannot prove that Neumann or Shambeau engaged in conscience-shocking behavior. The same analysis applies to the plaintiffs' claim for deprivation of the right to bodily integrity and provides additional grounds for granting summary judgment on this claim.

## D. State Created Danger

In their remaining federal claim, the plaintiffs allege that the City of West Bend, Neumann, and Shambeau are liable for due-process deprivations caused by a state-created danger. The doctrine of state-created danger is an exception to the rule that due process "does not transform every tort committed by a state actor into a constitutional violation" and that due process "confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 196, 202 (1989). The exception provides that "when a public official 'affirmatively places a particular individual in a position of danger the individual would not otherwise have faced,' the official may be liable for a due-process violation if injury results." *Estate of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) (quoting *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)). This exception is "quite narrow and reserved for 'egregious' conduct by public officials." *Id.* (quoting *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015)).

A due-process claim premised on state-created danger requires proof of three elements: (1) the government, by its affirmative acts, created or increased a danger to the plaintiff; (2) the government's failure to protect against the danger caused the

18

plaintiff's injury; and (3) the conduct in question "shocks the conscience." *Id.* The cases generally say that the third element—conscience-shocking conduct—requires a culpable state of mind equivalent to deliberate indifference, meaning criminal recklessness. *Id.* However, in one case, the Seventh Circuit described as "unsettled" the question of whether the recklessness standard is equivalent to criminal rather than civil recklessness. *Slade v. Bd. of Sch. Dirs.*, 702 F.3d 1027, 1029–30 (7th Cir. 2012). But the court acknowledged that the potential difference was slight: under either standard, the defendant must fail to avert a "serious" risk that is both "obvious" and "eminently avoidable." *Id.* The only difference between the criminal and civil recklessness standards is that, under the criminal standard, the risk must not only be obvious, but the defendant must actually know that it exists. *Id.* The only case in which the difference in standards might matter is one in which the risk would have been obvious to a normal person but the defendant, being "especially obtuse," failed to recognize it. *Id.* In any event, it is clear that showing that a government official made a bad decision or acted negligently or with gross negligence is insufficient to establish liability under a state-created-danger theory. *Flint v. City of Belvidere*, 791 F.3d 764, 770 (7th Cir. 2015); *McDowell v. Vill. of Lansing*, 763 F.3d 762, 766 (7th Cir. 2014).

In the present case, the plaintiffs contend that the first element—an affirmative government act that created or increased a danger to them—is satisfied because the City of West Bend operated a landfill that accepted hazardous waste for disposal. (Pl. Br. at 20, ECF No. 60.) The cases express some uncertainly over what qualifies as an "affirmative act" for purposes of this element. *See Slade*, 702 F.3d at 1030–33. However, I will assume that the city's operation of a landfill satisfies this element. Notably, however,

19

the plaintiffs do not allege that defendants Neumann and Shambeau took any affirmative acts that created or increased the danger to them. Rather, as discussed above, the plaintiffs allege only that these defendants failed to properly respond to the dangers caused by the city's operation of the landfill decades earlier. Thus, it is questionable whether the plaintiffs could prove the first element of their claim against Neumann and Shambeau. Moreover, these defendants would almost certainly be entitled to qualified immunity, as the plaintiffs do not cite any case clearly establishing that one government official could be personally liable for failing to protect someone from a danger created by other government officials. Ultimately, however, I do not have to determine whether Neumann and Shambeau committed an "affirmative act" because, as discussed below, the claim against them fails for other reasons.

The plaintiffs contend that the second element of their claim—causation of injury—is satisfied because contaminated groundwater from the landfill migrated to their properties. Notably, however, the plaintiffs do not claim that the state-created danger was a cause of any personal injuries—no plaintiff claims to have experienced physical harm from exposure to contaminated groundwater or vapor intrusion. Although the plaintiffs contend that such exposure presents a *risk* of physical harm, that satisfies only the first element of the state-created-danger test. Exposure to hazardous substances *is* the state-created danger; only if an injury results from that exposure would the second element be satisfied. Nonetheless, the plaintiffs allege that the mere presence of contaminated groundwater and soil on their properties has devalued their properties. Because the

alleged devaluation of their properties was caused by the operation of the landfill, I will assume that the plaintiffs could satisfy the second element of their claim.[3]

An insurmountable problem with the plaintiffs' claim is that no conscience-shocking behavior is either alleged or hinted at by evidence in the record. The facts that I have chronicled in the background section, above, show that once the city learned that leachate from the landfill was contaminating surrounding properties, it took steps to decrease the risk posed to the community. In accordance with DNR recommendations, the city closed the landfill, began monitoring the spread of the contamination, and provided a new source of drinking water to residents whose private wells were tainted with hazardous substances. Later, the city installed extraction pumps to reduce the quantity of contaminated groundwater migrating away from the site. When, in 2018, the DNR suggested that vapor intrusion might be a problem, the city studied the issue, learned that vapor intrusion was in fact a problem, and immediately began testing homes and mitigating any found dangers. To date, no person has reported suffering ill effects from vapor intrusion. Although the plaintiffs contend that further investigation of the defendants' conduct and the extent of the dangers posed by vapor intrusion is warranted, they do not and cannot dispute these basic facts. And given these facts, it is difficult to imagine what the plaintiffs could discover that would shock the conscience. In their complaint and in

---

[3] Some district courts have concluded that the state-created-danger exception does not apply to deprivations of property. *See Gabriel v. Andrew Cnty., Mo.*, No. 5:18-cv-06158, 2019 WL 3210086, at *3 (W.D. Mo. July 16, 2019); *Labella Winnetka, Inc. v. Vill. of Winnetka*, No. 07-C-6633, 2009 WL721136, at *6 n.3 (N.D. Ill. March 18, 2009). Because I conclude that the plaintiffs' claim fails for other reasons, I do not explore this issue.

their briefs, the plaintiffs do not even hypothesize a set of facts under which the defendants' conduct could reasonably be described as conscience-shocking.

The plaintiffs' strategy, instead, has been to criticize various aspects of the defendants' response to the problem and assert in conclusory fashion that the defendants' failure to adopt what plaintiffs describe as "best practices" in the field of environmental science is conscience-shocking. (Pl. Br. at 1, ECF No. 60.) I discuss the plaintiffs' criticisms below. As will be seen, the most that the plaintiffs could claim, even after further discovery, is that city officials acted negligently.

The plaintiffs contend that the city's constitutional violation began in 1979, when groundwater contamination was discovered at the landfill. (Pl. Br. at 13.) The plaintiffs assert that, once contamination was discovered, the only appropriate response was to immediately "remediate the groundwater," by which I understand them to mean take whatever steps were necessary to completely remove contaminants from the groundwater. (*Id.*) However, the plaintiffs present no evidence or argument suggesting that the failure to immediately remediate the groundwater was reckless. The plaintiffs' argument seems to be that because the contaminants in the groundwater were carcinogens, the only conscionable response would have been immediate, complete remediation. But the plaintiffs provide no support for this view. They instead ask me to take it is a given that the presence of a carcinogen in an area inhabited by humans is always extremely dangerous and warrants the most aggressive response possible. That, of course, is not the case. Ultraviolet rays from the sun are carcinogens, but no one suggests that government officials act recklessly by pruning trees that are providing shade to nearby residences. The relevant question is not whether government officials

22

know that carcinogens are nearby, but whether they know that humans are being exposed to them in dangerous quantities. Whether the government acted recklessly depends on the extent of the known risk and the expense of possible preventative measures. Only if the risk was "serious and eminently avoidable" could the government have acted recklessly. *Slade*, 702 F.3d at 1029.

Notably, the plaintiffs' experts do not opine that West Bend acted recklessly in failing to immediately remediate the groundwater. One of their environmental consultants, Frank Anastasi, notes that the city has not meaningfully remediated the area and states that if remediation had occurred, humans would not today be exposed to hazardous substances. (Anastasi Decl. ¶¶ 53–54, ECF No. 60-21.) But Anastasi does not opine that, given the state of environmental science at the time when the groundwater contamination was discovered, the only non-reckless response to the problem was complete remediation. Nor do the plaintiffs' experts opine that the mitigation measures taken by the city at the time—closing the landfill and providing an alternative source of drinking water to affected properties—were so deficient as to amount to deliberate indifference to a serious risk of harm to surrounding landowners. The experts seem critical of the city's early choices, which the city made after receiving advice from its own environmental consultant and approval from the DNR. But this is nothing more than a disagreement among experts, with the plaintiffs' experts having the benefit of hindsight. At most, these differences in opinion might support a negligence claim. They do not support the *mens rea* element of the state-created-danger exception.

I recognize that the plaintiffs have asked that I defer deciding the motion for summary judgment until after they have taken additional discovery. But the plaintiffs do

23

not even describe a plausible scenario under which the city's failure to immediately remediate the contamination could be deemed reckless. The immediate concern was the presence of contaminants in the groundwater, and the city addressed that problem by replacing well water with city water. Although more recently the city learned that vapor intrusion is a concern, the plaintiffs do not even suggest that the city should have been aware of that issue in the 1980s. The plaintiffs' expert on this topic, Mark Kram, states that the risks from vapor intrusion were not even formally recognized by environmental practitioners until the 1990s. (Kram Decl. ¶ 15, ECF No. 60-1.) Thus, a small city government with no environmental staff could not have been expected to know in the early 1980s that failing to remediate the contamination would lead to the potential for vapor intrusion.

The plaintiffs next focus on a letter written by the city's environmental consultant in 1985. (ECF No. 60-8.) In the letter, the consultant advised the city that, if the city opposed the DNR's attempts to remediate the landfill, the DNR might attempt to have the site brought within the Superfund, *i.e.*, brought within the scope of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). The consultant advised the city that "the best strategy is to maintain cooperation with the DNR to avoid the Superfund ranking." (*Id.* at 9.) Apparently, the city followed this advice, as it has been cooperating with the DNR ever since. The plaintiffs seem to imply that the city's choice to cooperate with the DNR and address the contamination on its own rather than oppose the DNR and wait for it to impose Superfund status was reckless. However, the city's choice to cooperate was certainly not conscience-shocking. Again, the plaintiffs'

argument seems to be that anything short of immediate, complete remediation was irresponsible, but nothing supports that claim.

In 1991, the city began the process of installing extraction wells to remediate the groundwater. The plaintiffs describe this as a feeble attempt at remediation, but they do not show that failing to do more was reckless. The plaintiffs note that it took several years to get the wells fully operational and that certain wells have occasionally malfunctioned or been shut down for various reasons. (Pl. PFOF ¶¶ 15–25.) However, the plaintiffs do not suggest that the problems with the wells were caused by the deliberate indifference of city officials or that the city recklessly allowed the wells to remain dormant. Indeed, some of the problems that the plaintiffs identify were caused by acts of God, namely, lightning and windstorms. (*Id.* ¶¶ 18, 25.)

The plaintiffs next criticize the defendants' actions with respect to vapor intrusion. Their criticisms relate to two broad issues: (1) whether the City of West Bend, Neumann, and Shambeau acted appropriately once the DNR raised the possibility of vapor intrusion in 2018; and (2) whether these defendants knew about the possibility of vapor intrusion prior to 2018. With respect to the first issue, the plaintiffs' criticisms can be further subdivided into two topics: (a) criticism of the city's failure to notify the public about vapor intrusion until October 2019, and (b) various technical criticisms of the city's investigation into the extent of vapor intrusion and the mitigation measures taken in response.

I first address the plaintiffs' contention that the defendants acted recklessly by failing to notify the public about the dangers of vapor intrusion between April 2018 and October 2019. The DNR first mentioned the possibility of vapor intrusion during the site visit on April 26, 2018. (*See* ECF No. 40-2.) In the background section, above, I described

25

the city's efforts during the ensuing months to study the issue. This included having the city's environmental consultant evaluate the potential for vapor intrusion during the summer of 2018, prepare a report to the DNR, install monitoring wells in early 2019, and test residences for the presence of VOCs. By September 2019, the consultant had prepared a report showing that vapor intrusion was a concern in certain areas. In response to this report, the city immediately notified residents that a public meeting would be held in October 2019. Following the meeting, the city expanded its testing and arranged for mitigation measures to be installed at homes found to have concerning levels of VOCs in the air or under the foundation.

The plaintiffs assert that the city's failure to notify the public about vapor intrusion between late April 2018 and October 2019 is conscience-shocking. However, no reasonable jury could agree. As of late April 2018, the DNR had only requested an investigation into the *potential* for vapor intrusion. No threat to residents' health had yet been discovered. The threat was not actually known until the city conducted testing at residences and learned that some structures contained concerning levels of VOCs. Notably, neither the plaintiffs nor their experts contend that the city's investigation proceeded at a pace that exhibited recklessness. And once the city's consultant informed the city that the test results showed a threat to residents' health, the city immediately notified the public and began the process of installing mitigation measures. Nothing in this sequence of events even plausibly suggests that city officials acted egregiously.

Next, I address the plaintiffs' technical criticisms of the city's investigation and mitigation response. Most of these criticisms appear in the declaration of the plaintiffs' vapor-intrusion expert witness, Mark Kram. (ECF No. 60-1.) The criticisms involve matters

26

such as whether the city should have used more stringent regulatory standards than the Wisconsin DNR's for determining when concentrations of VOCs are concerning (Kram Decl. ¶ 25), whether AECOM used appropriate scientific techniques when conducting its investigation (*id.* ¶¶ 27–46), and whether the city should have tested all residences in the subdivision rather than only those residences in the area that AECOM identified as being susceptible to vapor intrusion (*id.* ¶ 47). But these kinds of criticisms reflect only disagreements among experts that might support a negligence claim, not conduct that shocks the conscience. Moreover, the city defendants are not themselves hydrogeologists or experts on vapor intrusion, and thus they could not have been expected to review or second-guess AECOM's work. Finally, AECOM provided reports about its investigation and the city's response to the Wisconsin DNR. In February 2020, the DNR sent a letter to the city that complimented it on its response, confirmed that AECOM was on the right track, and noted that the city had "quickly addressed" certain issues that the DNR had raised. (ECF No. 42-2 at 2.) If the DNR did not deem AECOM's approach unreliable, then the city's non-expert officials could hardly have been reckless in following its advice. Accordingly, the city defendants are entitled to summary judgment on any claim based on their conduct after April 2018.

I next address the plaintiffs' claim that the city defendants knew about the potential for vapor intrusion prior to April 2018 but failed to act to protect residents. Here, the plaintiffs admit that they currently have no evidence suggesting that Neumann, Shambeau, or anyone employed by the City of West Bend was aware of the potential for vapor intrusion in the area around the landfill prior to the DNR's raising the issue. Moreover, Shambeau and Neumann have each filed a declaration stating that, until the

DNR raised the issue in April 2018, they did not know that contaminated groundwater could create vapor that could seep into structures. (Neumann Decl. ¶¶ 9–11; Shambeau Decl. ¶ 10–11.) And the city's environmental consultant has filed a declaration stating that, at the time the DNR raised the issue, there was no known incident of vapor intrusion into residences from the groundwater near the landfill. (Linnemanstons Decl. ¶¶ 24–26.)

The plaintiffs, however, contend that summary judgment on this question should be deferred until the completion of discovery. They contend that additional discovery might reveal that someone at the city learned about the concept of vapor intrusion prior to 2018. But the plaintiffs' finding evidence that someone at the city was generally aware of the concept of vapor intrusion would not be enough to prove that city officials engaged in conscience-shocking behavior. Instead, to prove their claim, the plaintiffs would have to show that a city official disregarded an obvious risk of vapor intrusion that was both serious and eminently avoidable. *Slade*, 702 F.3d at 1029. This would require showing, at a minimum, that some city official possessed information that would cause an ordinary person to realize that vapor intrusion obviously presented a serious risk to residents of the area around the landfill and that the city could have easily taken steps to eliminate that risk.[4] For the risk to have been obvious to a city official, that official would have to have possessed substantial knowledge of environmental science and the conditions at the landfill or have been advised by a consultant with such knowledge. Perhaps it is reasonable to think that further discovery will show that an environmental professional

_____

[4] If the standard of criminal recklessness applies, the plaintiffs would have to show that a city official had actual knowledge of the risk, not just that the risk would have been obvious to an ordinary person.

retained by the city was generally aware of the concept of vapor intrusion prior to 2018. But unless the professional both thought that vapor intrusion was a concern at the landfill *and* notified the city that the safety of residents was at stake, the city could not be thought to have acted recklessly.

Now, while it may be conceivable that evidence of this nature could be found through further discovery, the discovery taken so far has been enough to render the idea fanciful. The defendants report that they have already provided the plaintiffs with over 100,000 pages of documents and that the plaintiffs have received documents from the city's environmental consulting firm through a subpoena. (Def. Reply to Def. PFOF ¶ 122.) Further, the plaintiffs have demonstrated that they have had access to documents from the DNR and the city's environmental consultants because they have filed many of them in support of their opposition to the defendants' motion for summary judgment. Although the plaintiffs state that not all communications between the DNR, the city, and AECOM have been provided (Nace Decl. ¶ 7), they do not identify any outstanding discovery requests or explain what is missing. The plaintiffs also state that depositions and an exploration of verbal communications are warranted, but as noted, the key witnesses have already stated under oath that they did not think that vapor intrusion at the landfill was even potentially a problem until 2018. The plaintiffs have not identified any likely grounds for impeaching their testimony. In light of all this, it is clear that the plaintiffs' request for further discovery is based on nothing more than "a fond hope that more fishing might net some good evidence." *Smith v. OSF HealthCare System*, 933 F.3d 859, 864 (7th Cir. 2019).

Moreover, even if the plaintiffs were to find evidence that the city was aware of dangerous vapor intrusion at properties surrounding the landfill prior to 2018, such evidence would not support the due-process claims that the plaintiffs have brought in this case. Remember, the plaintiffs do not claim that exposure to VOCs has caused them to suffer bodily injury or disease. Thus, the plaintiffs do not claim that the city's delay in acting on a known danger of vapor intrusion caused them to suffer bodily harm, and their only potential injury from a state-created danger is a deprivation of property—the reduction in the value of their properties due to contaminated groundwater and soil. But the city's learning of and disclosing a danger of vapor intrusion prior to 2018 would not have prevented this deprivation of property. That is so because the deprivation of property occurred when the contaminated plume migrated onto the plaintiffs' properties, not when the city first *learned* that the plume had migrated onto the plaintiffs' properties or was causing vapor intrusion. By the time vapor intrusion was discovered, the alleged deprivation of property must have already occurred, as vapor intrusion was a consequence of the plume's presence underneath the properties. Moreover, as discussed above, conscionably responding to the risk of vapor intrusion did not necessarily entail complete and immediate remediation of the contamination. Instead, the city could have non-recklessly responded to the risk of vapor intrusion by installing mitigation measures such as sub-slab depressurization systems and air purifiers. So, even if the city had been aware of the risk of vapor intrusion prior to 2018, the condition of the plaintiffs' properties would not be any different than it is today. It follows that the city's hypothetical delay in disclosing its own knowledge of the risk of vapor intrusion could not have deprived the plaintiffs of property or otherwise caused injury to their properties. For these reasons, I

30

conclude that additional discovery on whether the city was aware of the potential for vapor intrusion at the landfill prior to 2018 would be futile. *See Smith*, 933 F.3d at 868 (district court may deny Rule 56(d) motion when the additional discovery being sought would be futile).

In a related argument, the plaintiffs contend that the defendants acted with deliberate indifference by "concealing" the fact that leachate from the landfill had been contaminating the groundwater in the area for decades. (Pl. Br. at 6–7, 14–16.) By "concealing," the plaintiffs appear to mean that the City of West Bend did not provide individualized notice of the contamination to each and every resident in the area, for the plaintiffs point to no evidence that city officials took any affirmative steps to cover up the contamination. Moreover, the defendants have shown that the landfill's problems have long been part of the public record. During the 1980s and 1990s, local newspapers published stories about contamination at the landfill, including about the city's having compensated a private landowner whose well was contaminated by leachate. (Neumann Decl. Ex. H, ECF No. 41-8.) All the work that the city has done to respond to the problems at the landfill has been discussed during public meetings of the city's common council and are memorialized in documents available under open-records laws. (Shambeau Decl. ¶¶ 17–18, 42.) And of course, the city provided individualized notice to residents of vapor intrusion in September and October 2019. The fact that the plaintiffs might not have been aware of some this information does not imply that the defendants were engaged in a cover-up.

Moreover, to the extent that the plaintiffs are claiming that they were entitled to individualized notice prior to 2018, they have not shown that such notice was necessary

31

to prevent them from suffering a deprivation of life, liberty, or property from a state-created danger. As discussed, the plaintiffs do not claim that the state-created danger caused them to suffer bodily injury, sickness, or disease. Thus, the failure to give earlier notice could have injured the plaintiffs only if such notice would have prevented a state-created danger from causing a deprivation of property. The plaintiffs do not identify any way in which notice of the problems at the landfill could have prevented the injuries that they allege—the devaluation of their land due to the presence of contamination in the soil and groundwater. To be sure, the plaintiffs allege in their complaint that they would not have purchased property in the Villa Park subdivision had they known about the problems with the landfill. (Compl. ¶ 39.) But the alleged deprivations of property occurred when the contamination migrated to the groundwater and soil of each tract of private property. Separate deprivations of property did not occur each time a contaminated property changed hands.

Accordingly, the defendants are entitled to summary judgment on the plaintiffs' due-process claim premised on state-created danger.[5]

## E. Relinquish Supplemental Jurisdiction

Because all federal claims have been dismissed, I will relinquish supplemental jurisdiction over the state-law claims under 28 U.S.C. 1367(c)(3).

_____

[5] Because I conclude that the plaintiffs cannot establish a constitutional violation, I do not separately address West Bend's argument that the plaintiffs have not established the facts necessary to impose municipal liability under _Monell_. _See Gaetjens v. City of Loves Park_, 4 F.4th 487, 495–96 (7th Cir. 2021) (municipality is not liable under § 1983 absent constitutional violation by municipal employee). Likewise, I do not discuss West Bend's argument that it is immune from liability under state law.

## III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that West Bend's motion for summary judgment (ECF No. 37) is **GRANTED**. The federal claims against the City of West Bend, Doug Neumann, and Jay Shambeau are dismissed on the merits. The court relinquishes supplemental jurisdiction over the state-law claims asserted against all defendants.

**IT IS FURTHER ORDERED** that the Clerk of Court enter final judgment.

Dated at Milwaukee, Wisconsin, this 4th day of May, 2022.


/s/Lynn Adelman_____
LYNN ADELMAN
United States District Judge

33